Mi\ Justice BRADLEY
 

 stated the history and nature of the title on both sides, and delivered the opinion of the court.
 

 Louisiana, as possessed by the French prior to 1763, embraced not only the entire territory west of the Mississippi, but also extended east of that river, along the Gulf of Mexico, as far as the Perdido, the present boundary between Alabama and Florida. By the treaties of 1763 France ceded the latter portion, lying east of the Mississippi, except the city and. island of New Orleans, to Great Britain, and the residue to Spain. Subsequently (in 1783), .Spain acquired the part ceded to Great Britain, and thus became possessed of the entire territory on our western and southern borders. On the 1st of October, 1800, a secret treaty was made at St. Ildefonso, between Spain and Bonaparte, then First Consul, by which Spain agreed, on certain conditions to be performed, to retrocede to the French republic “ the colony or province of Louisiana with the same extent that it now has in the hands of Spain, and that it had when France possessed it, and
 
 such as it ought to be after the treaties subsequently entered, into between Spain and other states.”
 

 The ambiguity of this last expression was the cause of the subsequent misunderstanding between Spain and the United States. Did it mean that Spain was to retrocede to France
 
 *635
 
 all the territory which the latter had formerly possessed under the name of Louisiana, or only so much as remained after the separation of West Florida therefrom, and the cession thereof to Great Britain ? The United States contended the former, Spain the latter.
 

 The importance of this question arose from the fact that the cession of Louisiana by Bonaparte to the United States included in precise terms what had been retroceded by Spain to France. The treaty of April 30, 1803, after reciting the exact language, of the treaty of St. Ildefonso, describing the colony Or province of Louisiana as above stated, ceded “the
 
 said
 
 territory, with all its rights and appurtenances, as fully and in the same manner as they had been acquired by the French republic in virtue of the .above-mentioned treaty with his Catholic Majesty.”
 

 In accordance with her construction of the treaty of St. Ildefonso, Spain refused to surrender the possession of the territory cast of the Mississippi and Iberville Rivers which she had acquired from Great Britain, and which the English had named West Florida, and she retained possession of it and exercised full sovereignty over it for many years after-wards.
 

 Notwithstanding this refusal of Spain to deliver up West Florida, the United States, through the executive and legislative departments of the government, always claimed that it was covered by the two treaties of cession, and insisted that it rightfully belonged to them, though no demonstrations -were made to dispossess the Spanish authorities until 1810, when President Madison issued a proclamation directing that possession should be taken, but at the same time declared that the right thereto should remain, as it had continued, a subject for amicable negotiation with the Spanish government. Possession was taken by the United States accordingly.
 

 During the period that Spain remained in possession, her authorities continued to grant lands, not only in small parcels to actual settlers, under her colonization laws, but in large tracts to speculators and favorites.
 

 
 *636
 
 From 1803 to 1806, inclusive, the Spanish intendant, Morales, made many such grants (of which the grant in question was one), and which have ever since been the subject of much litigation and dispute, never being recognized as valid by our authorities, unless so recognized by the act of 1860, hereafter referred to.
 

 Immediately after acquiring possession of Louisiana, in 1803, Congress passed an act to organize temporary governments in the newly acquired domain. This act, which was passed on the 26th day of March, 1804, created two territories — one, embracing all that part of the ceded country lying south of Mississippi Territory, east of the Mississippi River, and south of the 33d parallel of latitude west of that river, to be called the Territory of Orleans; the .other, embracing all the residue of the ceded country, namely, that portion lying west of the-river Mississippi and north of the 33d parallel, to be called the District of Louisiana. By the 14th section of this act all grants of land within the ceded territories, the title whereof was, at the date of the treaty of St. Ildefonso (October 1, 1800), in the crown, government, or nation of Spain,
 
 were declared, void,
 
 except
 
 bond fide
 
 grants made to actual settlers prior to December 20, 1803, not to exceed one mile square to each settler, and the usual proportion for his wife and family.
 

 According to the views of our government this act extended to West Florida (so called) as well as to Louisiana, and as a part thereof. President Madison, in 1810, in the proclamation referred to,
 
 *
 
 commences with these words:
 

 “ Whereas the territory south of the Mississippi Territory and eastward of the river Mississippi, and extending to the river Perdido, of which possession was not delivered to the United States in pursuance of the treaty concluded at Paris on the 30th of April, 1803, has at all times, as is well known, been considered and claimed by them as being within the colony of Louisiana conveyed by the said treaty, in the same extent that it had in the hands of Spain, and that it had when France originally possessed it,” &c.
 

 
 *637
 
 He then states that the United States had forborne to take possession, not from any distrust of their title, but from motives of conciliation towards Spain, and shows why it was inexpedient to delay taking possession'any longer, and concludes by directing Governor Claiborne, “ governor of the Orleans territory, of which the said territory is to be taken as part, to take possession of the same, and to exercise over it the authorities and functions legally appertaining to his office.”
 

 By the act of 25th April, 1812, after possession of "West Florida had been assumed by our government, commissioners were appointed to investigate all the titles and claims to lands in that territory, and the claim now before us was laid before the proper commissioner and rejected on the ground that the territory ivas a part of Louisiana ceded to the United States in 1803, and that the authority of Spain over the same had ceased by the treaty of St. Ildefonso of October 1, 1800. Other claims belonging to the same category met with a like fate. A list of these claims, rejected by the commissioner for the district between the Mississippi and Pearl Livers, may be found in the American State Papers.
 
 *
 
 The commissioner reports, that in his opinion these claims ought not to be confirmed: 1st, because the government of the United States claims an absolute property in the territory; 2d, because the Spanish government evidently distrusted its own right to make these grants, as they were made in a manner entirely different from the usages and customs always before observed in granting lands. It was not the custom of Spain to make sale and gain of her public lands, but to grant them to actual settlers. Nevertheless, the commissioner suggests whether the United States government, by permitting Spain to remain in possession of the country, and thus to impose upoD persons purchasing lands in good faith, was not morally bound by considerations of equity and policy to make these purchasers some compensation.
 

 
 *638
 
 These events happened prior to the treaty between Spain and the United States, entered into February 22, 1819, by which his Catholic Majesty ceded to the latter all the territories
 
 belonging to
 
 him, situated to the eastward of the Mississippi, known by the name of East and West Florida.
 

 By the 8th article of that treaty it is stipulated as follows:
 

 “ All the grants of land made before the 24th of January, 1818, by his Catholic Majesty, or by his lawful authorities
 
 in the said territories ceded
 
 by his Majesty to the United States, shall be ratified and confirmed to the persons in possession of the lands to the same extent that the same grants would be valid if the territories had remained under the dominion of his Catholic Majesty.”
 

 When this treaty came before the courts it was held that it furnished no aid to the disputed claims, since it only guaranteed grants made by the King of Spain in the territory ceded by that treaty; and the territory ceded onl^ embraced such territory as
 
 belonged,
 
 to the King of Spain; and as the United States held that the disputed territory did not belong to him, no grants made by him therein were confirmed by the treaty.
 

 In 1829 the case of
 
 Foster and Elam
 
 v.
 
 Neilson
 
 came before this court on a claim for 40,000 arpents of land under one of the grants of Morales, precisely like the claim now before the court. The case is reported in 2 Peters,
 
 *
 
 and contains,' in the arguments of counsel and the opinion of the court, a complete history of the controversy. Chief Justice Marshall ably reviews the argument of our government in favor of its claim under the treaties of St. Ildefonso and of April 30th, 1803. He admits that the former is susceptible of a twofold construction; but he concludes, and that was the judgment of the court, that the judicial department is bound by the construction adopted by its own government. He says :
 
 †
 

 “If those departments which are intrusted with^the foreign intercourse of the nation, which assert and maintain its interests
 
 *639
 
 against foreign powers, have unequivocally asserted its rights of dominion over a country of which it is in possession, and which it claims under a treaty; if the legislature has acted on the construction thus asserted, it is not in its own courts that the construction is to be denied. A question like this respecting the boundaries of nations is, as has been truly said, more a political than a legal question, and in its discussion the courts ■of every country must respect the pronounced will of the legislature.”
 

 The Chief Justice then turns to the question whether the treaty of 1819 had effected any chauge in the position of these grants before the courts. After quoting the eighth article of the treaty, which stipulates that “ all the grants of land made before the 24th of January, 1818, by his Catholic Majesty, or by his lawful authorities, in the said
 
 territories
 
 ceded, &c., should be ratified and confirmed,” he inquires what territories were
 
 ceded;
 
 and observes that the cession did not embrace
 
 all
 
 territories situated to the eastward of the Mississippi, but all the territories
 
 which belonged, to him
 
 (the King of Spain) thus situated. If, according to the position assumed by our government, the Uuited States had already acquired a full title to West Florida, as far to the eastward as the Perdido River, then Spain had no title, and ceded nothing therein; and, by consequence, the stipulation in the eighth article of the treaty in favor of grants made by. his Catholic Majesty “in the territories ceded” would not apply to the grant then before the court. Another difficulty in the case, as viewed by the court, was in the form of the stipulation. It was, that all grants “
 
 shall be
 
 ratified and confirmed,” not “are ratified and confirmed;” a form of expression which the court held required the intermediate action of the legislature confirmatory of the grants before the courts could act upon them. For these reasons the court decided against the claim.
 

 In the subsequent case of Arredondo,
 
 *
 
 on an examination of the Spanish side of the treaty, the court held that the last
 
 *640
 
 point made in
 
 Foster
 
 v.
 
 Neilson,
 
 was untenable; and that the treaty
 
 toas
 
 a present confirmation of the grants referred to in it;
 
 *
 
 and the same was decided in
 
 United States
 
 v.
 
 Percheman.
 

 †
 
 But this did not affect the question at issue. The main objection still remained.
 

 Meantime attempts were made in Congress to secure the recognition of these Spanish grants, but without success. In February, 1832, a resolution was passed by the House of Representatives, calling on the Secretary of State for his opinion of the justice and validity of the claims arising upon those grants, and of the expediency of providing by law for their final adjustment. Mr. Edward Livingston, the then Secretary of State, who had been counsel for the claimants, made a lengthy and able report,
 
 ‡
 
 stating the history of the grants and the questions arising thereon, and strongly urging their justice and the expediency of providing for their settlement. He contended that this was called for in the exercise of good faith towards the Spanish government, which, whatever views we might have entertained with regard to our own title, had always considered us pledged by. the treaty of 1819 to recognize and validate her grants, and had expressed very decided complaints at our failure to do so.
 

 Mr. "Wiekliffe, from the Committee on Public Lands in the House, to whom the secretary’s communication was referred, made a report combating its conclusions with great energy:
 

 “Are we to be told” (says the report),
 
 §
 
 “ at this time of day, that our title to the territory between the Mississippi and Per-dido was not valid until the treaty of 1819, and that by that treaty
 
 we purchased
 
 that part of Louisiana by the name of ‘ all the territories which belong to him (his Catholic Majesty), situated to the eastwai’d of the Mississippi, known by the name of East and West Florida?’ What was East and West Florida in 1819 ? Did it include any part of the territory between the
 
 *641
 
 Mississippi and the Perdido ? Had not the United States, under and by virtue of the treaty between France and Spain, and between the United States and France, long prior to 1819, taken possession of the same by expelling the Spanish power therefrom? And who doubted, in'1819, her right both of jurisdiction and soil ? And who, till now, ever supposed that the United States, by the treaty of 1819, imposed upon herself the obligation to confirm these grants made by Spain in violation of her solemn treaty stipulations ? . . . The committee will not do the then administration so much injustice as to suppose they would negotiate a treaty with Spain for the avowed purpose of the acquisition of Bast and West Florida, in terms designed to conceal the important fact from the Congress of the United States that by said treaty they were bound to confirm claims to near 600,000 acres of land which had, by an act of solemn legislation, been declared null and void, and which originated in a violation of the treaty of St. Ildefonso and of that with France' in 1803.’’
 

 This extract serves to show the temper with which these claims were viewed at that day by many of our leading Btatesmen. Of course, no advance was made in their favor on this occasion.
 

 The next case in this court in which grants of land between the Mississippi and Perdido Rivers came in question was
 
 Garcia
 
 v.
 
 Lee,
 
 in 1838.
 
 *
 
 The- court, in that case, reaffirmed
 
 Foster
 
 v.
 
 Neilson,
 
 and held that, as this territory did not belong to Spain after the treaty of St. Ildefonso, but belonged to the United States, according to its construction of the treaty, the Spanish grants therein made after 1800 were invalid, and were not confirmed by the eighth article of the treaty of 1819. Chief Justice Taney, delivering the opinion of the court,
 
 †
 
 said:
 

 “Indeed, when it is once admitted that the boundary line, according to the American cpnstruetion of the treaty, is to be treated as the true one in the courts of the United States, it would seem to follow, as a necessary consequence, that the
 
 *642
 
 grant now before the court, which was made by the Spanish authorities within the limits of the territory which then belonged to the United States, must be null and void, unless it has been confirmed by the United States by treaty or otherwise. It is obvious that one nation cannot grant away the territory of another.”
 

 Again:
 

 “In the case before us the grant is invalid from an intrinsic defect in the title of Spain. It is true she still claimed the country, and refused to deliver it to the United States. Blither conduct was, in this respect, .a violation of the rights of the United States and of the obligation of treaties.”
 

 The court relied on the act of 1804 as giving notice of the determination of the United States to claim the territory and to ignore any grants made therein, except to actual settlers.
 

 In this state of the decisions it was in vain for claimants under these grants to think of resorting longer to the courts of the United States. They, accordingly, again applied to Congress, and on June 17, 1844, procured a law by which the act of May 26, 1824, relating to land titles in Missouri, was extended to Louisiana and Arkansas and the district between the Mississippi and Perdido Rivers, and the District Courts were invested with jurisdiction over laud claims originating with either French, Spanish, dr British authorities.
 
 *
 
 This act authorized any pei’son claiming land by virtue of any French or Spanish grant, concession, warrant, or order of survey legally made or issued before the 10th of March, 1804, which was protected or secured by the treaty with France of April 30, 1803, and which might have been perfected into a complete title had not the sovereignty been changed, to present a petition to the District Court stating the case, and have the claim adjudicated upon and settled according to the law of nations, the stipulations of any treaty, the acts of Congress, and the laws of the former gov-
 
 *643
 
 eminent, subject to an appeal to the Supreme Court of the United States. A number of suits for lands in the disputed district were soon after commenced in the District Court; amongst others, one by the heirs of John Lynde for the tract in question in this case. But the claimants were still unsuccessful in this court.
 

 The first case reported is that of
 
 United States
 
 v. Reynes.
 
 *
 
 It was a case precisely like the one now before the court, and was rejected on the ground that the act of May 26, 1824, related to inchoate and incomplete titles, and was intended to give a means of completing them. The court reaffirmed
 
 Foster
 
 v.
 
 Neilson,
 
 and held that Spain could not make any valid grant in the disputed territory after the treaty of St. Ildefonso, and that the act of March 26, 1804, which had never been repealed, had pronounced all such grantg void. The court adhered to the same views in
 
 United States
 
 v. D’Auterive,
 
 †
 

 United States
 
 v.
 
 Philadelphia and New Orleans,
 

 ‡
 

 Montault
 
 v.
 
 United States,
 

 §
 

 United States
 
 v. Castant,
 
 ǁ
 
 and a number of other eases in the same term, including the case now before .the court. These cases were decided in 1852. ■
 

 In view of this long course of decisions, all to the same pui’poi’t, it must be considered as judicially settled in this court that Louisiana, as ceded to the United States in 1803, embraced the territory between the Mississippi and Perdido Livers, and that our government had a perfect legal right, whatever may have been its moral or honorary obligations, ■to ignore all grants made by the Spanish authorities after the treaty of St. Ildefonso went into effect. It must also be regarded as judicially settled that the treaty of 1819 confirmed grants of land made in the Floridas, east of the Per-dido, but not those made to the west of that river, unless made to actual settlers or made before the treaty of St. Ildefonso went into effect. If the political departments of the government felt bound, from considerations of honor and
 
 *644
 
 good faith, or from motives of conciliation and policy, to give effect to any other grants, it was for them to do so.
 

 This is what the claimants insist has been done.
 

 But that the government of the United States has always continued to insist upon its own construction of the treaties, whenever they are referred to as matter of right or historic derivation of title, is manifest, among other things, from the act admitting Florida into the Union as a State, passed so late as March 3, 1845, by which the boundaries are fixed as follows:
 

 “Said State of Florida shall embrace the territories of East and West Florida, which, by the treaty of amity, settlement, and limits between the United States and Spain, on the 22d day of February, 1819, were ceded to the United States/’
 
 *
 

 It is well known that Florida, as thus limited, extended only to the Perdido River, all the territory west of 'which had long previously been assigned- to the States of Louisiana, Mississippi, and Alabama, which were respectively admitted into the Union, with their present boundaries, in 1812,1817, and 1819.
 

 It is evident, therefore,- that the case of the claimants, if it cau stand at all, must stand on the voluntary bounty of our government, exerted through its legislative department. And the question in this case is, whether that bounty has, in fact, been exerted.
 

 After the unsuccessful attempt made i$ the courts, as last referred to, under the Missouri act of 1824, the subject was again brought to the attention of Congress in -May, 1858. Mr. Benjamin, who had been counsel for the claimants in the last cases, made a report to the Senate as chairman of the Committee on Private Land Claims, and submitted a bill for the relief of the claimants. This report contained a very full history of the treaties and litigation, giving a favorable view7 of the Spanish side of the question. Suffice it to say, in consequence of this report, Congress passed the act of June 22,1860, entitled “ Au act for the final adjustment of private
 
 *645
 
 land claims in the States of Florida, Louisiana, and Missouri, and for other purposes.” This act provides that any person claiming lands in Florida, Louisiana, or Missouri, by virtue of grant, concession, or warraut of survey emauating from any foreign government prior to the cession of the territory to the United States,
 
 or during the period when any such government claimed
 
 sovereignty,
 
 or had the actual possession of the district or territory in which the lands claimed are situated,
 
 shall be authorized to make application for the
 
 confirmation of his title
 
 in the manner pointed out in the act, which appoints commissioners to hear and determine the applications, and to make report to the commissioner of the land office. This officer, if he approves, is to report the same to Congress for its action and filial decision thereon: and it is provided that if the lands, or any of them, have been sold by the government, or cannot be surveyed and located, the claimant, if his title be confirmed, shall have the right to enter a quantity equal in extent to the lands thus sold, upon any of the public lands of the United States, subject to private entry at one dollar and twenty-five cents per acre.
 

 By the eleventh section it is provided, that where the lauds claimed have not been in possession of and cultivated by the claimant for the period of twenty years, and where the lands are claimed by complete grant or concession, &c., made prior to the cession of the territory to the United States,
 
 or where such title ivas created and perfected during the period while the foreign government from which it emanated claimed sovereignty over or had the actual possession of such territory,
 
 the claimant may, at his option, instead of submitting his claim to the commissioners, proceed, by petition, in the proper District Court of the United States, subject to appeal to the Supreme Court, whose decision is to be final; and if the claim be sustained, a patent is thereupon to issue for so much of the lands claimed as remained unsold, and for so much as may have been sold the claimant is to have the right to enter an equal quantity upon the public lands, as before stated.
 

 That the object of this act was to confirm the grants in question seems hardly to admit of a doubt. It is true, that
 
 *646
 
 in prescribing the powers and duties of the special commissioners and the courts to whose decision the applications were to be referred, it is provided that they shall decide thereon according to
 
 equity and justice.
 

 *
 

 But it can hardly be contended, especially in view of what has already been said,' that Congress meant by this language to authorize the said commissioners and courts to review the entire subject, and to decide what our government ought to have done with regard to these grants. It could not have been the intention to throw the whole discussion open, from the treaty of St. Ildefonso down to the present time, and to confer upon the tribunals named in the act the power which properly belonged to the political department of the government, and to impose upon them the duty of declaring what the policy of the government should be; or to-leave it to their, perhaps varying, judgments what was the true intent and meaning of the original treaties. That could not have been the design of Congress. The act authorizes the claimants to present their claims for
 
 confirmation;
 
 and although it does not, in so many words, say that grants made by foreign governments, while in possession of the territory and claiming sovereignty over it, if complete, regular, and fair, shall be sustained; yet that is the unavoidable inference to be derived from its language, and from the events and course of decisions out of which it ai’ose. And although it does not expressly repeal that part of the act of March 26th, 1804, which declared void all grants of land within the ceded territories made after the date of the treaty of St. Ildefonso; yet its provisions, in order to have any effect at all, must be regarded as irreconcilable with that clause of the act of 1804, and, consequently, as repealing it by implication.
 

 Ve cannot avoid the conclusion, therefore, that the .act of June 22d, 1860, was intended to validate all grants which were made by the Spanish government to
 
 bond fide
 
 grantees of lands in the disputed territory whilst the government remained in possession of the territory and claimed sover
 
 *647
 
 eignty over it, subject, of course, to the express exceptions of the treaty of 1819, and the supplementary declaration of the King of Spain finally annexed thereto.
 

 What range of discretion was intended" to be conferred upon the special commissioners and the courts by authorizing them to decide according to the principles of equity and justice, is, perhaps, not entirely clear. The probable meaning is, that these principles are to be applied to each particular case. If it should appear that a grant was obtained by fraud, or was affected by any other special vice, it would be the duty of the tribunals to reject it. Or, if it should appear that a claim was honest and meritorious, but defective in point of form or completeness, it might be the duty of the tribunals to sustain it as an equitable, if not a strictly legal title.
 

 This view of the subject relieves us from the ungracious task of construing treaties, and reviewing the conduct and policy of the government. Congress, by the act of 1860, has declared its own policy, and has left us simply the office of judicially carrying out its enactments in individual cases as they come before us. Congress has laid down the general rule by placing the grants in- question on a platform of e'quality with grants made by our own government, and has left to the tribunals the duty of examining the merits of particular applications.
 

 An examination of the case before us shows that the grant to John Lynd-e was made in due form and after regular surveys; and that the consideration was.duly paid to the Spanish government. Nothing has been developed in the case which goes to assail the
 
 bondjides
 
 of the transaction, unless it be the fact of obtaining the grant from Morales (who was Lynde’s father-in-law) after the treaty of cession, and when it was known that the Uuited States claimed the territory. But as this can be said of all these grants, and was one of the considerations that must’have been patent to the mind of Congress when it enacted the law of 1860, we must presume that it was waived by that body, and has ceased to be a valid ground of objection.
 

 Decree affirmed.
 

 
 *648
 
 Mr. Justice CLIFFORD dissented from the decree,’upon the ground that the act of Congress iu question did not confirm any claim previously adjudged void by the Federal courts in pursuance of a prior act of Congress conferring jurisdiction to hear and determine the controversy.
 

 *
 

 11 Stat. at Large, 761.
 

 *
 

 Title Public Lands, vol. vi, p. 501.
 

 *
 

 Page 253.
 

 †
 

 Page 309.
 

 *
 

 6 Peters, 691.
 

 *
 

 6 Peters, 737-743.
 

 †
 

 7 Id. 51.
 

 ‡
 

 See it, American Archives, Public Lands, vol. vi, p. 495.
 

 §
 

 Ib. Public Lands, vol. vi, pp. 507-8.
 

 *
 

 12 Peters, 511
 

 †
 

 Page 521.
 

 *
 

 5 Stat. at Large, 676.
 

 *
 

 9 Howard, 127.
 

 †
 

 10 Howard, 609.
 

 ‡
 

 11 Id. 609.
 

 §
 

 12 Id. 47.
 

 ǁ
 

 Ib. 437.
 

 *
 

 5 Stat. at Large, 743.
 

 *
 

 See
 
 §§
 
 2 and 11.