## UNITED ·STATES v. CLAMORGAN.

## CLAMORGAN v. UNITED STATES.

1. The court reaffirms its rulings in *Scull* v. *United States* (98 U. S. 410) as·to the nature of the title whereon a suit. can, under sect. 11 of the act of June 30, 1860 (12 Stat. 85), be maintained against the United States for lands claimed under a grant from the French or the Spanish authorities in Louisiana.
2. The claim in this cause, founded upon an alleged grant made at St. Louis by Trudeau, lieutenant-governor, March 3, 1797, examined, and *held* not to be within the provisions of that section.

APPEALS from the District Court of the United States for the Eastern District of Missouri.

This was a suit for lands in Missouri, brought against the United States by parties claiming under James Clamorgan, who presented his petition, — which they filed as an exhibit, — dated at St. Louis, March 1, 1797, to Don Zenon Trudeau, Lieutenant-Governor of Upper Louisiana, praying there be granted to him on the western side of the river Mississippi, some leagues above the mouth of the Missouri, the tract of land bounded on one side by the little river called Lacharette, *alias* Dardenne, and on the other by the little river called Au Cuivre, — one on the south, the other on the north, will serve as boundaries to those two sides; also sixty arpens of land in front of the banks of the Mississippi, immediately adjoining the mouth of the first above-named river, Lacharette, in descending the current of the Mississippi; and again sixty arpens in front, also, on the banks of the Mississippi, adjoining immediately to the upper side of the mouth of the second above-named river, Au Cuivre, and ascending the current of the Mississippi. The depth of the three different above-described tracts of land to be extended by two lines starting from the banks of the Mississippi, one from the most southern and the other from the most northern point (of the front) of the above-demanded tracts, which two lines·shall be run parallel on each side, in a westwardly direction, until they reach the top of the high hills in the rear; and from there the said two lines to be continued and prolonged in the same westwardly direction until they reach a point at the distance of about two hun-

dred arpens from the foot of said hills, and then those two extreme points shall be connected together by a straight line which shall be run so as to form the fourth side of the said three tracts here above demanded; the said lines encompassing in their extent all the waters of the above-mentioned rivers, Lacharette, *alias* Dardenne, and Au Cuivre, in order that hereafter the petitioner may erect saw and grist mills thereon, also place there a number of cattle, have slaughter-houses, and send salt meat to the capital.

The plaintiffs also filed the following papers as exhibits : —

"Don Zenon Trudeau, captain in the regiment of Louisiana, lieutenant-colonel by brevet, and lieutenant-governor of the western part of Illinois :

"Cognizance being taken of the statement made by Don Santiago Clamorgan, and the governor-general, the Baron de Carondelet, having particularly recommended to me to facilitate and protect the discovery and commerce of Upper Missouri, in which the above-named Clamorgan has engaged at my entreaties, considering the losses which said enterprise has occasioned to him, and the new expenses to which he shall have to contribute on account of the same undertaking, and how important it is to favor and extend the discoveries herebefore mentioned, without prejudice to the royal treasury, and to the interest and welfare of these settlements, but, on the contrary, in contributing to their prosperity by drawing new inhabitants :

"For these considerations, and on account of the said Clamorgan having rendered himself worthy and deserving of the favors of the government, the surveyor of this jurisdiction (as soon as the occupations of his place will permit) shall survey in favor of the party interested the extent of land he solicits in the way and manner described in the foregoing document, which, together with the plat and certificate of survey, and of the boundaries which shall be set (to said land), will form the title of concession, which in due time he shall have to lay before the general government of the province, in order to get its approbation and record.

"ZENON TRUDEAU.

"ST. LOUIS, March 3, 1797."

"ST. LOUIS, July 3, 1797.

"Under date of April 5, of this current year, the governor-general, Baron de Carondelet, writes to me as follows : —

" 'I have read your official note, dated 11th of last March, in which you state the motives which have induced you to grant to Mr. Clamorgan the tract of land situated between the two rivers Charette and Cuivre, both emptying into the Mississippi; also sixty arpens to the south of said rivers, which serve to determine the situation of said land, having the Mississippi in front. Two parallel lines are to be drawn, running in the interior of the country until they reach at the distance of two hundred arpens beyond the foot of the first hills, conformably to the solicitation of the party interested.

" ' All which I do approve, Clamorgan having deserved this favor from the government.'

" I transmit the same to you for your knowledge and government. May God have you in his keeping many years.

"ZENON TRUDEAU.

" S'or DON SANTIAGO CLAMORGAN."

Clamorgan filed, at St. Louis, June 27, 1808, notice of his claim before the recorder of land titles. He filed therewith the above evidence of title, and presented it to the board of land commissioners, Nov. 14, 1811. Upon it he claimed five hundred thousand arpens of land, situate on the rivers Mississippi, Dardenne, and Cuivre, district of St. Charles; sixty arpens front on Mississippi, Charette, and Dardenne, back to the hills about two hundred arpens, district of St. Charles; and sixty arpens of land front on the Mississippi, commencing above the mouth of the Cuivre, up the Mississippi and back to the hills. The board was of opinion that the claim ought not to be confirmed.

The claim was presented June 21, 1833, by the representatives of Clamorgan, to the board organized under the act of July 9, 1832, for the final adjustment of private land claims in Missouri. 4 Stat. 565. Testimony was taken, and the concession of Trudeau and his letter to Clamorgan produced. The members of the board, Sept. 26, 1835, recorded their unanimous opinion that the claim ought not to be confirmed.

The United States filed an answer to the bill in this suit denying its material allegations, and insisting as a bar to the relief claimed that the lands in question had not at the time of the cession of Louisiana been severed from the royal domain, the concession being only inchoate and the description of them

vague; and that the conditions of taking possession — viz. building mills, slaughter-houses, &c. — had never been performed by the claimant. It was admitted that the claimed lands had been sold or disposed of by the United States. The District Court, upon a final hearing, decreed that the concession by Trudeau, of March 3, 1797, to Clamorgan, ratified and confirmed April 5, 1797, by Governor-General Carondelet, was a title binding on the United States, and that the complainants were entitled to recover certificates for 94,136 acres, to be located upon public land subject to private entry.

From the decree the United States and the complainants appealed: the former assigning for error that the court below erred in not dismissing the bill; and the latter, that the decree should have been for 675,000 acres.

The remaining facts are stated in the opinion of the court.

*The Solicitor-General*, for the United States.

*Mr. Willis Drummond, Mr. William R. Walker*, and *Mr. J. L. Bradford*, contra.

MR. JUSTCE MILLER delivered the opinion of the court.

The decree was that Clamorgan and others recover of the United States certificates under the sixth section of the act of Congress of June 22, 1860 (12 Stat. 85), for 94,136 acres of land, to be located on any of the public lands of the United States subject to private entry, in lieu of the original concession by the Spanish authorities to James Clamorgan, their ancestor, all of the land embraced in that concession having been disposed of by the United States. That act having expired by its own terms, was revived by the act of June 10, 18˙2, and under it this suit was instituted against the United States in May, 1873. The statute in question was the subject of very full consideration at the last term in *Scull* v. *United States*, 98 U. S. 410. As we see no reason to modify the construction then given to it, we might, but for the very large amount involved, decide the present suit by a simple reference to that case as the foundation of our judgment.

The act of 1860 was the latest, as it was intended to be the end, of a series of statutes for the adjustment of land claims

within the territory ceded to the United States by France, but to portions of which there were private claims arising under the French and the Spanish governments, during the period of their respective proprietorship. These claims were in all stages of progress, from the merest permissive license to occupy, to the perfected grant of a tract identified by surveys and well-defined boundaries.

Immediately upon taking possession of the country, Congress legislated on the subject, and from that day to the act of June 10, 1872 (17 Stat. 378), the statute-books abound with laws to enable the claimants to establish their rights.

To that end several commissions were organized. As they expired by the terms of the law creating them, or by the time limited for prosecuting claims, they were renewed or others substituted. In most cases they were only empowered to hear testimony and report it to Congress, with an opinion in favor of or against each claim submitted. In other instances, the courts were vested with jurisdiction to hear and decide, and summary modes of procedure were authorized. In all this matter, Congress, whether acting directly upon the cases brought before it, or by statutes conferring authority on other tribunals to adjudicate them, acted with a sincere desire to do justice to those who, by the transfer of this large domain, were remitted to our government for the recognition of their rights. The treatment of these claimants has been governed by patience in hearing and rehearing, by extension of time for presenting claims, by affording repeated opportunities to establish them, and by that careful regard for every equitable consideration favorable to claimants, which merits the name of generosity rather than strict justice. It was in this spirit that, after all jurisdiction over the subject-matter had ceased to exist in any other tribunal, Congress passed the act of 1860, and renewed it for a short period in 1872.

But over half a century had passed since Congress first created a tribunal to hear these claims. The system of congressional surveys had been extended over the ceded territory, and in many instances the legal title to the claimed lands within its limits had passed by government sales and patents to innocent purchasers, who therefore held with that title the

superior equity. In liberality, however, towards these dilatory or unfortunate claimants, that act provided that, whenever a claim was established under it to lands so sold by the United States, the successful claimant might select an equal quantity from any public lands subject to private sale. The latter in many cases, indeed in far the greater number of them, vastly exceeded in value those to which the claim had originally attached.

While thus anxious to be both generous and just to this class of claimants, it may well be supposed, in view of the period which had elapsed during which they might have established their claims, and the opportunities which had been given them to do so, that Congress would impose such limitations on the exercise of the right here granted as would protect the government against false and fraudulent claims, supported by forged documents and perjured evidence, easily procured and difficult of detection and refutation, by reason of the great lapse of time and the death of those who were most cognizant of the transaction. We, accordingly, find that, with regard to the large body of these claims, Congress required that, after the evidence had been sifted by the registers and receivers, and reviewed by the Commissioner of the General Land-Office, the final confirmation of them should remain with that body. As we said, however, in *Scull* v. *United States* (*supra*), a much more limited and well-defined class of claims might, at the option of the claimants, be prosecuted in the District Court of the United States, whose territorial jurisdiction included the *locus in quo* of the lands. Over a suit thus brought, Congress retained no further control, and the judgment, subject to an appeal here, was made conclusive. The claimants in the present case have invoked this alternative, and they must fail on this appeal, if their case does not come within the class of which that court has jurisdiction, as defined in Congress.

There was excluded from confirmation under this act, either by the courts or the favorable report of the officers of the Land Department, any claim which had been theretofore presented for confirmation before any board of commissioners, or other public officers acting under authority of Congress, and rejected as being fraudulent, or procured or maintained by

fraudulent or improper means, or which previous boards had already twice rejected on the merits.

But aside from this exclusion, the description of the class of cases in which the District Court has jurisdiction to decree confirmation is found in the eleventh section of the act, which is copied and construed in the opinion in that case.

We again epitomize that construction: —

1. The documents, surveys, possession, or other acts on which claimant relies must have been completed during the period of the actual possession of the government, prior to that of the United States, under which the claim is asserted.

2. The claimant, or those under whom he holds, must have been out of possession for twenty years or more before the suit is commenced.

3. The claim must be sustained under a complete grant or concession from such government; or order of survey duly executed; or by other mode of investiture of original title in the claimants, by separation thereof from the mass of the public domain, either by actual survey or definition of fixed, natural, or ascertainable boundaries, or initial points, courses, and distances, by competent authority, prior to the cession of such lands to the United States.

We also said in that case that the action under that statute is substantially an action of ejectment in which the United States consents to be a defendant and sued as if in possession and the bar of the Statute of Limitations removed.

In the case before us neither the claimants nor any of their predecessors in interest were ever in possession of the land. There was no survey of it under the former government, nor has any yet been made for the purpose of locating the grant. There has never been any separation of it from the public domain, nor any attempt to separate it.

Is there any such definition of fixed, natural, ascertainable, boundaries, with courses and distances, in the supposed concession as will identify the land so as to make this separation?

As we have already said, no attempt has been made to make an actual survey which would establish an answer to this question. A sufficient reason for this may be found in the following extract from the decree itself: —

"And the parties to the above suits having by stipulation and agreement of record referred to the court *six plans or maps representing different modes of locating* said concession, . . . and the quantities of land represented by said plans having now been determined and reported to the court by a sworn expert, . . . it is ordered and decreed that the plan marked 'I' truly represents the lands conceded to Jacques Clamorgan."

The quantity of land embraced in the largest of these plans is estimated by this expert at 1,810,240 acres, and in the one adopted by the court, at 94,136 acres; the former quantity being nearly twenty times as much as the latter. The expert testifies that the estimate is as accurate as can be made in the absence of an actual survey in the field. And yet the claimants who appeal to this court in order to get the largest of these amounts did not even attempt to make an actual survey of the concession, which, if they are correct, is occupied by a highly civilized and thickly settled population, and there is no difficulty in making such survey other than what is found in the descriptive language of the grant. It is reasonable to suppose that that difficulty was known to be insurmountable, and this is confirmed by the irreconcilable differences of the conjectural plats, on which the government is to be *calculated* out of land scrip worth over $2,000,000. That the selection of one of these plats, almost at hazard, is to be made the foundation of the judgment of the court is directly opposed to the construction which this court has given to the section of the act under which it exercises this jurisdiction.

But if we examine the description afforded by this supposed concession for ourselves, we must arrive at the same conclusion. The only description is that found in Clamorgan's petition asking Lieutenant-Governor Trudeau for the concession. The two rivers therein mentioned, and the points where they respectively enter the Mississippi, are known or ascertainable. So, also, it is clear there could be ascertained the points sixty arpens above the mouth of the one, and as many below the other. But the point mentioned as the top of the high hills in the rear, in a westerly direction, is not known, and cannot be ascertained from any evidence in this record.

It is also clear from the plats presented to us that any two lines drawn west or westerly from points on the Mississippi River, sixty arpens north and south of the mouths of the Lacharette and Au Cuivre, parallel to each other, would cross one or both of those rivers, and leave a large part of the land lying between them out of the survey.  Nor is any attempt made to identify the high hills or two hundred arpens from the foot of said hills, where the line shall be drawn which is to close the survey by connecting the two lines first mentioned.

In short, without elaborating this matter as we did in Scull's case, it is apparent that when Clamorgan presented his petition, and undertook to describe the land which he sought to obtain, he had no knowledge of the ascending course of the two streams he mentioned, nor of the hills, if there were any, west of the Mississippi, nor of any thing else probably but the bottom lands adjoining that river.

If the survey which the Spanish manner of granting public lands required, and which the order of Lieutenant-Governor Trudeau required in this case, had been made, these mistakes would have been corrected, and the final concession from Governor Carondelet, who alone could make such a grant, would, either in that document or by reference to the executed survey, have given a sufficient description.  In *Scull* v. *United States* there was an attempt to supply the want of an actual survey by what the royal surveyor called " a figurative plan," and on this Governor Carondelet issued the final grant.

But in the present case there was neither an actual survey, nor a figurative plan, nor a final concession.   We have already shown that the description in the petition of the original claimant is not such as to enable any one to identify the land or make a definitive location of it.

That we do not attach more importance to this want of a sufficient description of land granted than Congress intended, may be seen by a reference to the third class of sect. 3 of the act, in which Congress directs the land-officers to include " all claims which, in their opinion, ought to be rejected, whether from defect of proof, suspicion of fraud based on probable ground, *uncertainty of location, vagueness of description,* or any other cause sufficient in their opinion to justify such rejec-

tion." Obviously, even before this board, which was only to report to Congress, uncertainty of location and vagueness of description were held to be sufficient grounds for their rejection of the claim. Much more is it a good ground in a judicial proceeding, under the limitations of the act which we have considered as binding the court.

Two other serious exceptions are taken to claimants' title to recover.

It is said that there was no completed grant made by the Spanish government; because Governor Carondelet, who alone could make such a grant, has not done so.

It is certainly open to grave doubt whether the extract from a letter of Carondelet to Trudeau, in which, among other things, he expresses his approval *of the motives* of Trudeau in making the order of survey in favor of Clamorgan, can be construed into an official act, which amounts to a grant, at a time when no survey had been made, nor any reason given for not making it.

So, also, the petition of the present claimants in the District Court in this suit shows that this claim was before different tribunals under the several acts on that subject, and was reported against in both instances, and that this was long ago.

Counsel for the government insist with much force of argument that the claim was thus " *twice rejected on its merits*," within the meaning of the statute under which we are now proceeding. But we do not think it necessary to examine either of these points critically, because we are satisfied that, on the first ground we have discussed, the case comes within *Scull* v. *United States*, and is not so well supported as that was in the matter on which it was decided.

This renders unnecessary the consideration of the appeal of the claimants.

The decree of the District Court will therefore be reversed, and the case remanded with directions to dismiss the petition on the merits; and it is

*So ordered.*