63 U.S. 406
 22 How. 406
 16 L.Ed. 357
 THE UNITED STATES, APPELLANTS,
v.
ANDRES PICO.
 December Term, 1859
 
 THIS was an appeal from the District Court of the United States for the northern district of California.
 The state of Pico's title is mentioned in the opinion of the court, and need not be repeated.
 The case was argued by the Attorney General and Mr. Stanton for the United States, and by Mr. Gillet for the appellee. It was very similar to the preceding case of Teschmaker.
 The Attorney General's statement of the evidence and argument upon it was as follows:
 This is a claim for eleven leagues of land called Moquelemos, which the claimant alleges, in his petition to the board of commissioners, was granted to him by his brother, Pio Pico, in the month of May, 1844, and confirmed to him in June, 1846. The land lies on the Moquelemos river, in what is now the county of Calaveras.
 The documentary evidence of title produced by the claim is:1. A grant signed by Pio Pico, and countersigned by Jos e Matias Moreno, describing the land in question, dated at the city of Los Angeles, on the 6th day of June, 1846.
 2. A paper headed 'Departmental Assembly of California,' and signed Narciso Botello, deputy secretary, addressed to Secretary Moreno, in which the fact is stated, that this grant, and others which are named, were approved by the Departmental Assembly in that day's session.
 NOTE.—The date of this paper (July 15, 1846) is certainly the date which it truly bears. It is so in all the records, the original Spanish as well as the translations.
 3. A paper signed by Pio Pico and Jos e Matias Moreno, dated June 15, 1846, setting forth that the most excellent Departmental Assembly, 'in session of to-day,' decreed the approval of the grant in question.
 This is all the documentary evidence in the case. There is no petition, order of reference, information, decree of concession, map, or copy of the grant, found among the archives. No map or diseno of the land was exhibited to the court below, or is to be found upon the record sent here. There is no registry nor any kind of entry upon any book. The grant was produced from the private custody of the grantee himself. So, it appears, was the certificate of Pico and Moreno, that it had been approved by the Departmental Assembly. Judge Hoffman distinctly declares that the only paper found in the archives is the communication of Botello, transmitting the title deed, and asserting its approval. Who placed that paper upon the record, and how or when it came there, are questions not easily solved. That it did not get there honestly, will be very apparent to the court, long before this examination is finished.
 No proof was offered of the genuineness of the paper with Botello's name to it, and found among the archives. But, to show that the other two papers, which were produced from the private custody of the claimant, were not forgeries——
 Nicholas H. Den was called, who testified that he knew the handwriting of Pico and Moreno, ant that their signatures to these two papers were genuine.
 On this evidence, the board rejected the claim, declaring that, in its opinion, the proofs and exhibits were insufficient to establish its validity. An appeal was taken by the claimant to the District Court, where the claimant called——
 Charles M. Weber, who states that the boundaries of the land described in the grant can be identified. In the fall of 1848, he learned, for the first time, that Pico had a claim to this land, which adjoins that of the witness. He made a gift to Pico of some small improvements that he had made on the land. He knows of no stock that Pico ever had on the land.
 Daniel Murphy says that, in 1848, he saw Pico on the land, with some twenty men and some horses. The witness himself afterwards had about 1,000 head of cattle upon it, and Pico allowed him to occupy it with about 1,500 more; was on the ranch, with Pico's consent, about eighteen months.
 This was absolutely all the evidence in the case. No proof of the documents was made by the testimony of the persons whose names were signed to them. Neither the Governor himself nor the countersigning secretary was called. Nobody swore even to their handwriting, except Nicholas H. Den. There was no evidence that the claimant ever had any possession; and his nearest neighbor, the owner and occupant of the adjoining tract, not only knew of no possession, but never even heard of the claim until after the discovery of the gold mines, and the commencement of the city of Stockton in the neighborhood. With this illegal and insufficient evidence of the documents, which the claimant had kept in his pocket without any evidence of possession or even claim, and without producing from the record a single entry to corroborate the allegation of the grant, he had boldness enough to demand a decree confirming his title and allowing his claim. The judge manifestly did not believe that the grant was a genuine one. He felt that the whole thing was a fabrication, but, in his opinion, he was bound to treat it as genuine, because Nicholas H. Den was unimpeached and uncontradicted, and he had declared it to be his opinion that the signatures of Pico and Moreno were written by themselves. But he adds, that any one acquainted with the facility and unscrupulousness with which, in this class of cases, frauds have been committed, and sustained by testimony apparently conclusive, a grant, unsupported either by evidence from the archives or by proof of occupation of the land, must appear suspicious. He then adds what seems to have finally determined him in favor of allowing the claim. He says, in the case at bar, a document is found in the archives, which affords the best, if not the only, moral evidence of the genuineness of the grant.
 The objections which the Government now makes to the affirmance of this decree are those which follow:
 1. The grant is made by the Governor to his own brother, and is therefore void.
 2. It is void, because Pio Pico, at the time of making it, had no authority, jurisdiction, or power, to make any grant in this case, for want of a petition, investigation, and map, such as the laws of 1824 and 1828 require in all such cases.
 3. There is no record evidence of the grant, nor any explanation furnished of its absence, and therefore it is, to all intents and purposes, the same as if no evidence at all of it had been given.
 4. It is a forgery. The proof of this is powerful and overwhelming. It is not possible to furnish any reason why the grant was not entered upon the record, if it was really made at the time it bears date. In addition to that, the journals of the Departmental Assembly furnish very strong circumstantial evidence against the genuineness of this title.
 It will be observed that the letter of Botello to Moreno is dated on the 15th of July, and it accompanies the title deeds of this and two other claims. The letter, as well as the deeds, professes to be sent for the information of his Excellency the Governor; and if there is any truth in that letter, the Governor could have had no information of it at any earlier period than its date. Yet we find the Governor's certificate, which purports to be extracted from the minutes of the Departmental Assembly, is dated on the 15th of June, just a month earlier than Botello says it was approved. These certificates, if actually signed by the parties whose names are attached to them, were made long after their date, and at a time when the parties who concocted the fraud supposed that the journals of the Assembly had been irrecoverably lost. But these journals have been found, are in the archives, have been fully authenticated, and they show that no such grant as this to Andres Pico was before the Assembly, either on the 15th of June, or on the 15th of July, or on any other day. The journal contains a very full account of everything that was done by the Assembly, especially with reference to land grants. The whole proceedings of the body on the 15th of June are given, and not a word is said about the approval of this or any other land title. On the 15th of July, no session was held. There was an adjournment from the 8th of July to the 24th of the same month, which was the last day that the Departmental Assembly ever met. The journal affords the strongest reason to believe that Pio Pico was not at Los Angeles, where both the grant and his certificate of approval are dated, at the times when they respectively bear date. Pio Pico met the Assembly, and was in his seat, as President, on the 3d of June. The journal says that, upon that day, a communication was received from the Commandante General, in which Fremont's invasion was mentioned, and the General requested the presence of his Excellency the Governor. At the next meeting of the body, Francisco Figueroa presided, Pio Pico being absent. On the 15th of June, Figueroa presided again. On the 1st of July, an official communication from his Excellency the Governor was read, dated at Santa Barbara on the 23d of June, transmitting copies of certain documents from the districts of the north, and expressing his Excellency's desire to have this honorable body near him, in order to consult with it upon the management and means of saving the country. Another document was also read from his Excellency, dated June 29, with an invitation to the Assembly to repair without delay to Santa Barbara, to enact the necessary measures to save the Department and chastise the invaders, making it [the Assembly] responsible before God and the nation, if it should neglect to go to that point. At all the subsequent meetings of the Legislature, Figueroa continued to be President, down to the session of July 8, 1846; and at an extra session on the 24th of July, being the last day of the Assembly's existence, Pio Pico was present. Inasmuch as he was, upon the 3d of June, requested to go to Santa Barbara, where the Commandante General was stationed, and as we see no more of his name upon the journals from that time until the 8th of July, it may reasonably be supposed that he left on the 3d of June, or immediately afterwards, in pursuance of the summons sent to him by the General. This very safe presumption will contradict the allegation that he issued a grant to his brother on the 6th of June; and it is very certain from the journals, that he was not at Los Angeles on the 15th of June, the date of his pretended certificate of approval. On the 15th of July, there was no session at all, and that makes it certain that Botello's certificate is false, from beginning to end.
 The argument of Mr. Gillet in the preceding case was applicable to this, and, in addition to the points therein reported, the following is now added, because it contains references to the former decisions of this court.
 6. It is to be presumed that Governor Pico performed his duty in relation to the necessary preliminaries of this grant, until the impeaching party proves to the contrary.
 In all official transactions, it is a universal rule, that the officer is presumed to have conformed to his official duty. Whoever disputes it, must make his proof, or be silent. In this case, we insist that this rule must be applied, If the law required the Governor to grant only on receiving petitions, making references and receiving reports, then it is to be presumed that all this was done. But references and reports are optional matters with him, and are not required unless he chooses. The legal presumption is, that he received a petition, if that was necessary, before the grant; and there is no evidence that he did not receive one, nor was this questioned below. All that can be said is, that the claimant did not produce and prove it on the trial below. If such evidence were necessary to make the grant a legal one, still it was not required to establish the equitable right, which can be proved without proving a full legal right.
 This presumption is really sustained by strong, if not conclusive proof. The Governor says, in the grant, that the grantee, 'a Mexican by birth, has solicited, for his personal benefit and that of his family, the land known, &c., * * * having first made the necessary inquiries and investigations according to the requisitions of the laws and regulations,' &c. Those who deny that there was an application, cannot sustain their position without charging the Governor with asserting a falsehood, as well as omission of duty.
 It is insisted on the other side that this statement of the Governor in the grant is no evidence of the fact alleged. This is an error. Even in case of private individuals, their statements, in notes, bonds, contracts, and deeds, are taken as true among themselves, and can in but few cases be disputed. But where an officer of Government makes a recital, stating that he has performed certain things required by law in the premises, such recitals are, unless otherwise provided by statute, taken and deemed to be true. The recitals by a sheriff in a deed, when he sells and conveys on execution, are always deemed to be true. The recitals by a magistrate in a writ, that an affidavit was made on which he issued the writ, are taken to be true. When the President recites, in a proclamation or order, that certain things have occurred, they are always taken as true. In cases of an insurrection, or compliance or non-compliance with a treaty, this court has so held.
 The production of a commission signed by the President, reciting that the Senate had consented to the appointment, is conclusive of the fact recited, and is also evidence that the President had made the nomination. His signature to a land patent is conclusive upon the Government, of the recitals it contains. It is evidence of the survey, and that (except in pre-emption cases) the land had been offered at public sale, without which it could not be granted. The recital that money had been paid under the act of 1820, or that the grantee or his assignor was entitled to bounty land, cannot be questioned by the Government. It is the same in the recitals in patents to half-breed Indians. The recitals in a land claim confirmed by this court cannot be disputed by the grantor or grantee, or those claiming under either, by subsequent conveyance. Those who dispute these recitals, where not estopped, must prove their allegations.
 It is a rule of nearly universal application, that the recitals by official personages, in papers made and issued in the line of their duty, are deemed and taken to be true. Public business could not be carried on without allowing such presumptions to prevail. The rule is as applicable to a California Governor in making a land grant, as to any other official person. His recital that there was an application, &c., is just as much to be relied upon as that in which he states that the grantee was a Mexican, or naturalized citizen, or of the secretary that the grant had been recorded or confirmed by the Assembly.
 In Fremont's case, the recitals in the grant were treated as true and highly important. The Chief Justice said: 'But the grant, after reciting that Alvarado was worthy, for his patriotic services, to be preferred in his pretensions for his personal benefit and that of his family, for the tract of land known by the name of Maroposas, to the extent of ten square leagues, within certain limits mentioned in the grant, and that the necessary requirements, according to the provisions of the laws and regulations, had been previously complied with, proceeds, in the name of the Mexican nation, to grant him the aforesaid tract, declaring the same by that instrument to be his property in fee, subject to the approbation of the Departmental Assembly, and the conditions annexed to the grant.'
 17 Howard, 558.
 'And the grant was not made merely to carry out the colonization policy of the Government, but in consideration of the previous public and patriotic services of the grantee. This inducement is carefully put forth in the title papers.' Id.
 He further said: 'It (consideration of personal merit) is an acknowledgment of a just and equitable claim.'
 Here the argument of the Chief Justice rested on this point wholly upon what the Governor recited in the grant or title papers. The Chief Justice also, at page 562, speaks of the fact of the inability to furnish a map being 'officially admitted' by the Governor.
 In Reading's case, Mr. Justice Wayne disposed of certain points made by the Attorney General by referring to and adopting as true certain facts recited in the grant. He said:
 'But the fact of Reading's Mexican naturalization is not an open question in this case. The record admits the regularity and genuiness of his documentary title for the land. The admission is good for all the necessary recitals in them, as it is for the main purpose for which they were inserted in those documents. That was a grant of the land. The recitals are those 'requisite conditions' stated in the second and third paragraphs of the decree of November 21, 1828, concerning which the Governor is enjoined to seek information, which, when affirmatively ascertained, make the foundation of the Governor's exercise of his power to grant vacant lands.'
 'In his petition for a grant, Reading says he is a native of the United States, and had resided in the country since the year 1842. The Governor states him to be a Mexican by naturalization in the grant, and 'that as the proper proceedings and investigations had been previously complied with according to the provisions and laws and regulations concerning the matter,' he, in virtue of the authority vested in him, grants the petitioner the land known as Buena Ventura. * * * Now, this is not merely the language of clerical formality, though it might be the same from usage in like cases, but it is a declaration of the Governor's official and judicial conscience, that his power to make the grant has been used in a fit case for the approval of the Departmental Assembly, or for the decision of the Supreme Executive Government, in case the action of the Assembly should make it necessary for him to carry it there for its decision. We consider it conclusive of the fact of the petitioner's Mexican naturalization, precluding all other inquiries about it, in our consideration of this case, by the record.'
 18 Howard, 8, 9.
 When Spanish and Mexican agents state that they hold certain offices, and are authorized to make grants, their averments thus made are taken to be true, and so this court has held. In Peralta's case, this court, by Justice Grier, said:
 'We have frequently decided that the public acts of public officers, purporting to be exercised in their official capacity, and by public authority, shall not be presumed to be usurped, but that a legitimate authority had been previously given, or subsequently ratified. To adopt a contrary rule would lead to infinite confusion and uncertainty of titles. The presumption arising from the grant itself makes it prima facie evidence of the power of the officer making it, and throws the burden of proof on the party denying it. The general powers of the Governors and other Spanish officers to grant lands within the colonies in full property, and without restriction as to quantity, and in reward for important services, were fully considered in this court in the case of the United States v. Clarke, 8 Peters, 436.'
 Mr. Justice NELSON delivered the opinion of the court.
 
 
 1
 This is an appeal from a decree of the Circuit Court of the United States for the northern district of California.
 
 
 2
 The appellee presented to the board of commissioners a claim for eleven square leagues of land, known by the name Moquelamos, situate in the county of Calaveras, California. The board rejected the claim; but, on appeal to the District Court, and the production of some further proof, that court affirmed it.
 
 
 3
 The preliminary proceedings required by the regulations of 1828, before a grant of the public lands, were not produced, if any existed. The only evidence of the title is a grant of the tract by a formal title to the claimant, dated Los Angeles, 6th June, 1846, signed by the Governor, Pio Pico, and J. M. Moreno, the Secretary of State, and two other papers, relied on as furnishing proof that the grant was approved by the Departmental Assembly. One of them is a certificate to that effect of the Governor and Secretary, bearing date 15th June, 1846; the other purports to be a communication from N. Botello, deputy secretary of the Departmental Assembly, of the approval, to Moreno, Secretary of State, for the information of the Governor. This approval, according to the deputy secretary of the Assembly, was in a session held on the 15th July, 1846. The paper was found among the Mexican archives.
 
 
 4
 The other documents—the grant and certificate of approval came from the hands of the claimant. No record of them was found among the Mexican archives or in any book, nor is there any evidence of possession or occupation deserving notice or consideration.
 
 
 5
 The case falls within the principles and is governed by the views of the court in the case of the United States v. Teschmaker and others, decided at this term. Besides the suspicious character of the grant, it appears to be wholly destitute of merit.
 
 
 6
 The decree below reversed, and the case remanded for further evidence.