## MUSE et al. v. ARLINGTON HOTEL CO.

(Circuit Court, E. D. Arkansas. June 1, 1895.)

1. PUBLIC LANDS—SPANISH GRANT.

The regulations of Gov. O'Reilly in the province of Louisiana of February 18, 1770 (section 12), provided that all grants should be made in the name of the king by the governor general, who would at the same time appoint a surveyor to fix the bounds thereof, both in front and depth, in the presence of the judge ordinary of the district and of two adjoining settlers, who should be present at the survey; that such four persons should sign the procés verbal made thereof; that the surveyor should make three copies of the same, one of which should be deposited in the office of the scrivener of the government, another directed to the governor general, and the third to the proprietor, to be annexed to the title of his grant. *Held,* that no title was conveyed by a paper purporting to be a Spanish grant, made while such regulations were in force, by the governor of such province, "of a tract of land of one square league, situated in the district of Arcansas, on the north side of the River Ouachita, at about two leagues and one-half distant from said River Ouachita, and understanding this land is to be measured so as to include the site or locality known by the name of 'Hot Waters,' as is besides expressed by the figurative plan and certificate of said surveyor, Trudeau, above named; and recognizing this mode of measurement, we approve of this survey, using the faculty which the king has placed in us, and assign in his royal name unto the said" grantee "the said league of land," etc., in the absence of any actual survey on the ground, and the filing of a copy thereof in the office of the scrivener of the government, and an actual putting of the grantee in pedal possession according to the form and proceedings then prevailing in Spain and such province.

2. LIMITATIONS—ACTION TO RECOVER LAND GRANTED BY SPAIN.

Act May 26, 1824 (4 Stat. 52), entitled "An act enabling the claimants of land within the limits of the state of Missouri and territory of Arkansas to institute proceedings to try the validity of their claims," permitted all persons claiming under French and Spanish grants to file petitions in various courts named, in order to have their titles confirmed, and provided that any claim to lands "within the purview of this act which shall not be brought by petition before the said courts within two years from the passing of this act, or which, after being brought before the said courts, shall, on account of the neglect or delay of the claimants, not be prosecuted to a final decision within three years, shall be forever barred," etc. Such act was several times extended; the last time for five years, by Act June 17, 1844 (5 Stat. 676). *Held,* that such statute bars an action brought in 1894 for a tract of land including the hot springs in the city of Hot Springs, Ark., by the heirs of a grantee of an alleged Spanish grant, dated February 22, 1788.

3. SAME.

Such action is also barred by Act Cong. June 11, 1870 (16 Stat. 149), known as the "Hot Springs Act," which gives all persons claiming title, either legal or equitable, "to the whole or any part of the four sections of land constituting what is known as the 'Hot Springs Reservation,' in Hot Springs county, in the state of Arkansas," an opportunity to institute suit in the nature of a bill in equity against the United States in the court of claims, "and prosecute to final decision any suit that may be necessary to settle the same: provided that no such suit shall be brought at any time after the expiration of 90 days from the passage of this act, and all claims to any part of such reservation upon which suit shall be not brought under the provision of this act within that time shall be forever barred."

4. PUBLIC LANDS—GRANT—ABANDONMENT—PRESUMPTION FROM LAPSE OF TIME.

A claim by a grantee of an alleged Spanish grant, dated February 22, 1788, or his heirs, to a tract of land including the hot springs in the city of Hot Springs, Ark., will be presumed to have been abandoned, in an

action brought by such heirs in 1894, to recover such tract of land, though it appears that such heirs brought a suit in the name of an assignee under Act May 26, 1824, for confirmation of the claim, which was dismissed for noncompliance with an order for the production of the original papers.

5. ESTOPPEL IN PAIS.
    In 1788 the hot springs were on lands occupied and owned by Indians. After the cession in 1818 the United States bought up the title of the Indians. In 1832 it reserved the property from entry and sale. Between such time and 1894 the government spent large sums for hospitals and improving and beautifying such property. A prosperous city was built about the springs, and by the joint labor and money of private citizens, such city, and the government, streets were laid out, parks established, churches and schoolhouses erected, railway connections created, and millions of dollars expended in hotels. *Held*, that the grantee of an alleged Spanish grant of the tract of land including the hot springs, dated 1788, and his heirs, none of whom ever paid anything for such grant, or any taxes on the land, or spent any money in making the many enduring and costly improvements thereon, are estopped from claiming an adverse title to such land.

This is an action of ejectment, brought on the 25th day of July, 1894, by the plaintiffs, as heirs of Juan Filhiol, against the defendant, for a tract of land including the hot springs in the city of Hot Springs, in this state. The plaintiffs rely for title on certain documents, copies of which are filed with the complaint, and are made exhibits hereto, and which are as follows:

1. A paper, made Exhibit A, purporting to be a Spanish grant, translated from the Spanish language to the English, in the following words:

                    "(From the Land Archives.)

"The governor intendent of the provinces of Louisiana and Florida West, inspector of troops, etc. Considering the anterior surveys made by the surveyor of this province, Don Carlos Trudeau, concerning the possession given to Don Juan Filhiol, commandant of this post of the Ouachita, of a tract of land of one square league, situated in the district of Arcansas, on the north side of the River Ouachita, at about two leagues and one-half distant from said River Ouachita, and understanding that this land is to be measured so as to include the site or locality known by the name of 'Hot Waters,' as is besides expressed by the figurative plan and certificate of said surveyor, Trudeau, above named, and recognizing this mode of measurement, we approve of this survey, using the faculty which the king has placed in us, and assign in his royal name unto the said Juan Filhiol the said league of land, in order that he may dispose of the same and the usufruct thereof as his own. We give these presents under our own hand, sealed with the seal of our arms, and attested by the undersigned, secretary of his majesty in this government and intendents.

"In New Orleans, on the 22nd of February, 1788.          Estevan Miro.
"By mandate of his excellence.
     "Andres Lopez Armesto.
"Registered."

2. A paper purporting to be a survey, also translated from the Spanish language, marked "Exhibit B," in the following words:

"Don Carlos Trudeau, land and particular surveyor of the province of Louisiana, in consequence of a memorial signed on the 12th of December of the year 1787 by Don Juan Filhiol, commandant of the post of Ouachita, and by order of his excellency, Don Estevan Miro, brigadier of the R. Ex. Gob., intendent of the province of Louisiana, West Florida, etc., dated the 22nd of February, 1788, directing me to give possession to the aforesaid commandant of a tract of land of one league square, situated in the district of Arkansas, to include that spot known by the name of the 'Warm Waters'; and in conformity with the aforesaid order I certify having measured in favor of the aforesaid commandant, Don Juan Filhiol, the league of land indicated in the memorial situated on the north side of Ouachita river, in the district of Arkansas, at about two leagues and a half distant from said river, to be verified by the figurative plan which

accompanies, in conformity with —— of the 6th of the present month of December, and of the current year, 1788.

"[Signed]                                              Carlos Trudeau."

Exhibit C to the complaint appears to be a deed from John Filhiol to Narcisso Bourgeat, conveying "a tract of land 81 arpents front and 42 in depth' on each side of the stream called the source of the hot springs, about two leagues from where it flows into the Ouachita river, having the source of the hot springs as a center, the boundary lines on the east and west running parallel to their full depth, bounded on both sides by public lands, being the same property acquired by me from Stephan Miro, then governor of these provinces, under date of December 12th, 1787." This deed is not dated, but on it there is indorsed an acceptance of it, dated November 25, 1803.

Then follows Exhibit D, which purports to be a retrocession by Narcisso Bourgeat to John Filhiol of "one league square, situated at the mouth of the Hot Springs creek, where it flows into the Ouachita, being the same property which he sold to me by act passed before Vincent Fernandez Texiero, then commandant of Ouachita post," dated July 17, 1806, signed by Narcisso Bourgeat.

The defendant demurred to the complaint because (1) it states no cause of action; (2) because, if plaintiffs have any remedy, it must be pursued in equity, and not at law. The defendant also filed exceptions to the documentary evidence as follows: "Comes said defendant, and excepts to the so-called 'land grant,' made an exhibit of evidence marked 'Exhibit A' to complaint, because (1) the said instrument does not purport to be official, or to come from any official depository. And said defendant excepts also to the paper purporting to be a survey made by Don Carlos Trudeau, marked 'Exhibit B,' to the complaint, because (1) it does not purport to be official; (2) it does not purport to come from any official depository; (3) because it shows no such survey as is required by law to sustain the pretended Spanish grant set up in said complaint. And the said defendant excepts to the instrument purporting to be a conveyance by John Filhiol, marked 'Exhibit C' to said complaint, because (1) the said deed does not purport to have been signed by the grantor therein; (2) because the same does not describe the land set forth in the complaint herein; (3) the said deed does not purport to come from any official source, or ever to have been filed in any office; (4) it is not authenticated as required by law. The defendant also excepts to the instrument purporting to be a retrocession by Narcisso Bourgeat, a copy of which is marked 'Exhibit D' to the complaint herein, because (1) it is not authenticated in a manner required by law; (2) it does not purport to come from any official source; (3) it does not purport to come from any official depository of conveyances of lands; (4) it does not describe the lands mentioned in the complaint."

C. H. Boatner, E. W. Rector, Dan W. Jones, and Mr. McCain, for plaintiffs.

Rose, Hemmingway & Rose, for defendant.

WILLIAMS, District Judge. By the statute of Arkansas the pleadings in the action of ejectment are very nearly assimilated to those of a suit in equity to quiet title. The pleading is special, and not general. In his complaint the plaintiff must set forth "all deeds and other written evidences of title on which he relies for the maintenance of his suit, and shall file copies of the same, as far as the same can be obtained, as exhibits therewith, and shall state such facts as shall show a prima facie title in himself to the land in controversy." Sand. & H. Dig. § 2578. All objections to exhibits must be made by exceptions to their admissibility before the trial. Id. § 2579. The object of this statute is to prevent surprise to either party; also to prevent, as far as may be, the discussion of questions of evidence during the trial, so that trials

may be rendered more expeditious, and that the attention of juries may not be diverted from their exclusive province. I do not find it necessary to notice the exceptions to the deed from Filhiol to Bourgeat, or the subsequent deed from the latter to the former. In the view of the case that I have taken, it is of no importance to consider whether the deed from Filhiol to Bourgeat, or the deed from Bourgeat to Filhiol, describes the same land referred to in the alleged grant, as contended for by the plaintiffs; for, if so, it is evident that the title of the plaintiffs is not affected by these conveyances, and that by the reconveyance Filhiol could only have acquired the same title that he held in the first instance. As the stream cannot rise higher than its source, and Filhiol could not grant any greater estate than he possessed, his title could not be improved by a conveyance to another and a reconveyance to himself. It is, however, necessary to consider the exceptions to the alleged grant by Gov. Miro, and the alleged survey of Trudeau. At the time that the alleged grant in this case was made, the regulations of Gov. O'Reilly of February 18, 1770, were in force in the province of Louisiana, the twelfth section of which reads as follows:

"All grants shall be made in the name of the king by the governor general of the province, who will at the same time appoint a surveyor to fix the bounds thereof, both in front and depth, in the presence of the judge ordinary of the district and of two adjoining settlers, who shall be present at the survey. The above-mentioned four persons shall sign the process verbal, which shall be made thereof. The surveyor shall make three copies of the same, one of which shall be deposited in the office of the scrivener of the government, another shall be directed to the governor general, and a third to the proprietor to be annexed to the title of his grant." Copied also in U. S. v. Boisdore, 11 How. 76. Also in volume 5, Am. St. Papers, pp. 289, 290.

These regulations were approved by the royal order of the king of Spain of August 24, 1770, after which they had the force of statutes which no official had the right to disregard. U. S. v. Moore, 12 How. 217. The Spaniards "were a formal people, and their officials were usually careful in the administration of their public affairs." White v. U. S., 1 Wall. 680. Some degree of conformity with laws thus actually in force must be shown by the plaintiff, "otherwise there can be no protection against imposition and fraud in these cases." U. S. v. Teschmaker, 22 How. 405. The applicant for a Spanish grant presented to the governor a petition, or "requete," as it was called, accompanied by what was called a "figurative" or "conjectural" map or plan of the land desired. This map was not made from an actual survey, but served to indicate in a general way the location of the land sought to be acquired, so that the officials might know whether it was vacant or not, and something of its real or prospective value. Without some such information, the governor could not act advisedly in making or in refusing the grant. In all cases there was an actual survey on the ground before the title of the crown was divested, followed by an actual putting the grantee in pedal possession; a proceeding which was the equivalent of delivery of seisin at common law, both ceremonies being derived from the feudal law. The figurative plan has sometimes been

called a "chamber survey" (Hunnicutt v. Peyton, 102 U. S. 361), because it was made in an office or other place remote from the land indicated (Scull v. U. S., 98 U. S. 420). The grant upon this chamber survey delivered out for actual survey "meant, not as with us, a perfect title, but an incipient right, which, when surveyed, required confirmation by the governor." U. S. v. Boisdore, 11 How. 99. Until an actual survey was made on the ground, the grant or concession was only a floating and unlocated claim. U. S. v. Hanson, 16 Pet. 200. The actual survey consisted of "running lines with compass and chain, establishing corners, marking trees and other objects on the ground, giving bearings and distances, and making field notes and plats of the works. These are the ingredients of an actual survey." Winter v. U. S., Hempst. 362, Fed. Cas. No. 17,895. Until actual survey made, no specific parcel of land was segregated from the public domain; and unless such a survey was made before the cession of Louisiana to the United States, no title passed to Filhiol, his heirs or grantees. In U. S. v. Lawton, 5 How. 26, the court, speaking on this subject, expressed the law as follows:

"It follows that the description, when applied to the facts, is too vague and indefinite for any survey to be made, and that, therefore, the claimants can take nothing under the concession, and that it is our duty to order the decree of the superior court of East Florida to be reversed, and the petition to be dismissed. We would remark, in addition, that this concession, in its leading features, cannot be distinguished from various others that have heretofore been brought before this court for adjudication, where no specific land was granted, or intended to be granted, but it was left to the petitioner to have a survey made of the land in the district referred to by the concession, by the surveyor general of the province, in due form, on the ground, and to cause the plat and certificate of such survey to be recorded by the surveyor general, by which additional public act the land granted was severed from the king's domain, but remained part of it until the survey was made and recorded. Until this was done, the warrant was a floating warrant of survey, not recognized by the government of Spain before the cession, nor by this government since, as conferring an individual title to any specific parcel of land on the petitioner."

Such an inchoate claim as Filhiol possessed at the time of the cession was of no kind of validity as against the United States, and, even if it had been expressly confirmed by act of congress, it would have derived its validity alone from that act, "and not from any French or Spanish element which entered into its previous existence." Dent v. Emmeger, 14 Wall. 312. Though the land had been actually surveyed as required by the regulations of Gov. O'Reilly, still the claim would have had no validity, unless a copy of the survey had been filed in the office of the scrivener of the government, as therein provided. "But the examination of the surveyor, the actual survey, and the return of the plat were conditions precedent, and he had no equity against the government, and no just claim to a grant until they were performed." Fremont v. U. S., 17 How. 554. On this subject the supreme court say:

"This concession was an incomplete grant, and did not vest a perfect title to the property in the grantee, according to the Spanish usages and regulations, until a survey was made by the proper official authority, and the party thus put in possession, together, also, with a compliance with other conditions,

if contained in the grant, or in any general regulations respecting the disposition of the public domain. Possession, with definite and fixed boundaries, was essential to enable him to procure from the proper Spanish authority a complete title." U. S. v. Hughes, 13 How. 2; U. S. v. Hanson, 16 Pet. 199.

If these are the rules to be applied where the grant in itself says nothing about a survey, they must have a more obvious application where the concession itself specifically requires such an actual survey to be made and returned. The grant in this case expressly provides "that this land is to be measured so as to include the site or locality known by the name of 'Hot Waters.'" Not only was an actual survey on the ground required by the law, but the grant itself made such an actual survey a condition precedent to any investiture of title. The governor approved the "figurative" survey of Trudeau, but he, as was certainly meet and proper, required that the land referred to should be measured and identified by an actual survey, which should leave nothing to conjecture. No right, legal or equitable, vested in the petitioner until survey was made and returned according to law. "The original concession granted on his petition was a naked authority or permission, and nothing more." Fremont v. U. S., 17 How. 554; Peralta v. U. S., 3 Wall. 440. Not only was it necessary that the actual survey should be made, but it and the survey must have been returned and filed as provided in the regulations of O'Reilly; otherwise there was no valid grant. In the Peralta Case, supra, the court said:

"Written documentary evidence, no matter how formal and complete, or how well supported by the testimony of witnesses, will not suffice if it is obtained from private hands, and there is nothing in the public records of the country to show that such evidence ever existed. But it may be said that the archives of the country may be lost or destroyed, and, if so, that the party in interest should not suffer. This is true; and if the claimant can show, to the satisfaction of the court, that the grant was made in conformity to law, and recorded, and that the record of it has been lost or destroyed, he will then be permitted to introduce secondary evidence of it. But the absence of record evidence is necessarily fatal, unless that absence can be accounted for."

See, also, U. S. v. Wiggins, 14 Pet. 350; U. S. v. Kingsley, 12 Pet. 476; Chouteau v. Molony, 16 How. 234; U. S. v. Cambuston, 20 How. 59; U. S. v. Castro, 24 How. 346; U. S. v. Knight, 1 Black, 227; U. S. v. Castillero, 2 Black, 163; Hornsby v. U. S., 10 Wall. 224; U. S. v. Power, 11 How. 577; U. S. v. Pico, 22 How. 406; U. S. v. Vallejo, Id. 416; U. S. v. Bolton, 23 How. 341; U. S. v. Vallejo, 1 Black, 541; U. S. v. Sutter, 21 How. 175; U. S. v. Hanson, 16 Pet. 199; Glenn v. U. S., 13 How. 250.

In this case, as in De la Croix v. Chamberlain, 12 Wheat. 601, the requirement mentioned in the grant being that there should be an actual survey, the title could in no event be perfected or completed until such survey was made and returned according to the provisions of the Spanish laws. See, also, Purvis v. Harmanson, 4 La. Ann. 421. This survey could not "be done by conjecture. Lines and corners must be established by the finding so as to close the survey." Denise v. Ruggles, 16 How. 243; Hunnicutt v. Peyton, 102 U. S. 359. From a careful review of the authorities, which are numerous, and in perfect harmony, it is clear that the

grant in this case "was not so separated by survey, or by any such distinctive calls as will admit of a survey." U. S. v. Miranda, 16 Pet. 153; U. S. v. Boisdore, 11 How. 99.

The treaty between the United States and France concerning the cession of Louisiana to the United States, adopted April 30, 1803, whereby the United States bound itself to protect the rights of the inhabitants of the province, has no application to merely inchoate claims, which were not binding on the governments of either Spain or France, but which existed only in entreaty. The treaty added nothing to the law of nations on the subject, and precisely the same rule has always been applied to inchoate entries made under the laws of the United States. Frisbie v. Whitney, 9 Wall. 192; Yosemite Valley Case, 15 Wall. 87; Shepley v. Cowan, 91 U. S. 330; Hot Springs Cases, 92 U. S. 713. So, the title of Filhiol, being incomplete at the time of the cession, the treaty "imposes upon the United States no obligation to make a title to lands of which the grantee had neither an actual seisin nor a seisin in law." U. S. v. Miranda, 16 Pet. 153; U. S. v. Hughes, 13 How. 2. In this case there is no pretense that there was ever anything in any Spanish record that could show any compliance with the Spanish laws in respect of the grant in question. Therefore the grant must be held to be ineffectual to convey any title, legal or equitable. White v. U. S., 1 Wall. 680. The necessity of an inquiry as to whether the contemporary Spanish law has been conformed to is emphasized by consideration of the case of U. S. v. King, 3 How. 773, where a suit was brought on a Spanish grant that had been forged; to the case of U. S. v. Samperyac, Hempst. 118, 7 Pet. 222, in which it was shown that 117 decrees rendered in the superior court of the territory of Arkansas were set aside on bills of review because such decrees had all been based on forged grants, and other cases growing out of similar frauds. At any rate the questions now under consideration are all settled by decisions of the supreme court of the United States.

The grant under examination, without a subsequent actual survey on the ground, describes no land whatever that can be identified. "A tract of land of one square league" does not, as a term of description, suggest any boundary whatever. The fact that the tract is described as "one league square" refers only to contents, and not to shape. No one familiar with Spanish grants would infer that the tract was to be square. The map of the United States published under the direction of the commissioner of the general land office purports to show in red colors all the Spanish and Mexican grants in our country. A glance at this map will disclose that such grants have been in all sorts of shapes, apparently at the will of the grantee; that only a few are square or in the form of a parallelogram, and that hardly any of them are laid off with any special reference to the cardinal points of the compass. A tract of land "about two leagues and one-half distant from said River Ouachita" is in the highest degree indefinite. The exact distance from the river is not mentioned, nor is there anything to indicate any point on the river to serve as a place of

beginning. It seems to have been suggested that the hot ·springs should be regarded as the center of the tract, but no such inference can be drawn. Lecompte v. U. S., 11 How. 125. It is a rule of "universal application in the construction of grants, which is essential to their validity, that the thing so granted should be so described as to be capable of being distinguished from other things of the same kind, or be capable of being ascertained by extraneous. testimony." Buyck v. U. S., 15 Pet. 225. In that case it was said by the court that "it was not possible to locate any land, as no part was granted." The court added that "the public domain cannot be granted by the courts." This rule has been frequently applied in other cases based on Spanish grants. Hunnicutt v. Peyton, 102 U. S. 359; U. S. v. Castillero, 2 Black, 20. In Vilemont v. U. S., 13 How. 267, the court said: "Nor is it possible to make a decree fixing any one side line, or any one place of beginning, for a specified tract of land." In Villabolos v. U. S., 10 How. 556, the court said: "In cases of a vague description this court has uniformly held that no particular land was severed from the public domain by the grant, and that no survey could be ordered by the courts of justice." In Scull v. U. S., 98 U. S. 413, a map was attached to the figurative survey. A surveyor· testified that from that map he could survey the land, and mark out its metes and bounds, and claimed that he had made an accurate survey of the land claimed; but the court held that there was no valid grant. In U. S. v. Boisdore, 11 How. 93, the claim was held to be void for the want of an actual survey. The court said that, if the identity of the land could not be fixed, and it could not be ascertained that any specific tract was severed from the public domain by the grant at the time that Spain ceded Louisiana, "then the claim cannot be ripened into a complete title by our decree, as we only have power to adjudge what particular tract of land was granted. Our action is judicial. We have no authority to exercise political jurisdiction, and to grant, as the governors of Spain had, and as congress has." See, also, U. S. v. Delespine, 15 Pet. 319. In Buyck v. U. S., Id. 225, the court said:

"We apply to the case the laws and ordinances of the government under which the claims originated, and that rule which must be of universal application in the construction of grants, which is essential to their validity, that the thing granted should be so described as to be capable of being distinguished from other things of the same kind, or be capable of being ascertained by extraneous testimony."

Only perfect titles were protected by the law of nations and by the treaty between France and the United States, and there could be no perfect title without an actual survey made previous to the cession of Louisiana. Dent v. Emmeger, 14 Wall. 312. So indispensable was an accurate survey that it has often been held that decrees confirming Spanish or Mexican grants under the various acts of congress allowing confirmations were void if the grants and surveys would not enable the courts to ascertain the specific boundaries of the tracts referred to. Ledoux v. Black, 18 How. 473; Menard v. Massey, 8 How. 293; Snyder v. Sickles, 98 U. S. 203; West v.

Cochran, 17 How. 403; Landes v. Brant, 10 How. 348; U. S. v. Halleck, 1 Wall. 439. In Stanford v. Taylor, 18 How. 412, the court said:

"The law is settled that, where there is a specific tract of land confirmed according to ascertained boundaries, the confirmee takes a title on which he may sue in ejectment. The case of Bissell v. Penrose, 8 How. 317, lays down the true rule. But where the claim has no certain limits, and the judgment of confirmation carries along with it the condition that the land shall be surveyed, and severed from the public domain and the lands of others, then it is not open to controversy that the title attaches to no land; nor has a court of justice any authority in law to ascertain and establish its boundaries, this being reserved to the executive department. The case of West v. Cochran, 17 How. 403, need only be referred to as settling this point. And the question here is whether the concession to Perry is indefinite and vague, and subject to be located at different places. It is to be forty by forty arpens in extent. It is to lie along the River Des Peros, from the north to the south; and to be bounded on the one side by the lands of Louis Robert, and on the other by the domain of the king. On which side of Roberts' land it is to lie we are not informed, further than that it is to lie along the river from north to south. The record shows that, if surveyed west of Roberts' tract, the forty by forty arpens includes the River Des Peres, but, if surveyed east of Roberts' land, it will not include the river. The uncertainty of out-boundary in this instance is too manifest, in our opinion, to require discussion to show that a public survey is required to attach the concession to any land."

To the same effect, see Lafayette v. Blanc, 3 La. Ann. 59.

The whole doctrine is summed up in what was said by Miller, J., in the Scull Case, supra:

"The title must be complete under the foreign government. The land must have been identified by an actual survey with metes and bounds, or the description in the grant must be such that judgment can be rendered with precision by such metes and bounds, natural or otherwise. There must be nothing left to doubt or discretion in its location. If there is no previous actual survey which a surveyor can follow, and find each line and its length, there must be such a description of natural objects for boundaries that he can do the same thing de novo. The separation from the public domain must not be a new or conjectural separation, with any element of discretion or uncertainty."

Nor does the certificate of the surveyor Trudeau help the matter. This merely recites a survey "to be verified by the accompanying figurative plan," but a recital in a grant that prerequisites had been complied with is not sufficient ground for a presumption that they have been observed. Fuentes v. U. S., 22 How. 443. The certificate of survey in this case is of no probative value whatever. It refers to no landmarks, natural or artificial, gives no lines of boundary, no metes, identifies nothing. It adds not a ray of light to the grant itself. In U. S. v. Castant, 12 How. 439, the boundaries were described by Trudeau "with great precision," and possession had been delivered by him to the grantee. Though the certificate of Trudeau in this case shows that he was directed by the governor in his grant to put Filhiol in possession of the land (which, however, is not true), it does not show that he had done so. The delivery of possession under the Spanish law was a formal and indispensable requisite. In U. S. v. Davenport, 15 How. 5, it is shown how the ceremony was performed. The official went on the land in the presence of the grantee and of witnesses, and took the grantee "by the right hand,

walked with him a number of paces from north to south, and the same from east to west, and, he letting go his hand, the grantee walked about at pleasure on the said territory of La Nana, pulling up weeds, and made holes in the ground, planted posts, cut down bushes, took up clods of earth and threw them on the ground, and did many other things in token of the possession in which he had been placed, in the name of his majesty, of said lands, with the boundaries and extension as prayed for." Nothing of the sort seems to have been done in this case. The certificate of Trudeau refers to the petition or memorial upon which Filhiol's grant was based, and to an accompanying figurative plan. Neither of these is produced, nor is the loss of either shown, nor are the contents of either alleged. It is easy to account for the fact that Trudeau does not certify any actual survey, or any delivery of possession. In 1788 the nearest white settlements to the hot springs were insignificant and remote. The lands were occupied by the Indians. To reach them would require a journey of many days, involving privation and terror. The lands had then no commercial value. Hence there was a total noncompliance with the regulations of O'Reilly. The Spanish laws prevailing at that time in the territory of Louisiana in regard to the Indian tribes were far more humane than any laws that have ever existed in this country. 5 Am. St. Papers, pp. 226, 232, 234. Yet it has always been held that the Indian right of occupancy in the United States was sacred until extinguished by cession to the federal government. U. S. v. Cook, 19 Wall. 591; Leavenworth, etc., R. Co. v. U. S., 92 U. S. 742; Cherokee Nation v. Georgia, 5 Pet. 1. So all Spanish grants "were made subject to the rights of Indian occupancy. They did not take effect until that occupancy had ceased, and whilst it continued it was not in the power of the Spanish governor to authorize any one to interfere with it." Chouteau v. Molony, 16 How. 239. Hence it is easy to account for the fact that in this case there was no survey, and no delivery of possession. The Indian title to the lands in controversy was not extinguished until the year 1818. At that time the pretended title of Filhiol had long since lapsed, because it was not possible to perfect it after the cession of Louisiana. The grant imposed "upon the United States no obligation to make a title to lands of which the grantee had neither an actual seisin nor a seisin in law." U. S. v. Miranda, 16 Pet. 153. "No survey of the land was ever made. The duty imposed upon the grantee to produce the plat and demarkation in proper time was never performed. This was a condition he assumed upon himself. The execution and return of the survey to the proper office in such case could only sever the land granted from the public domain. No particular land having been severed from the public domain, * * * his was the familiar case of one having a claim on a large section of the country unlocated. * * * In grants of land with uncertain designations, to be made on a large district of country, they must have been severed from the public domain by survey, or be void for want of identity." Id.; Carondelet v. St. Louis, 1 Black, 179. In Scull v. U. S., 98 U. S. 419, it was held that in suits brought to enforce rights growing out of Spanish claims the plain-

tiff must show "a title completed under the foreign governments, evidenced by written grant, actual survey, or investiture of possession." See, also, U. S. v. Hughes, 13 How. 1; U. S. v. Boisdore, 11 How. 92. Not only must there have been an actual survey by metes and bounds, but the grant itself, "with the memorials and other papers, whatsoever they might be, which had induced the governor to make the grant," must have been registered in the land office. Chouteau v. Molony, 16 How. 240. This rule is necessary, so "as to make the antedating of any given grant irreconcilable with the proof; otherwise there can be no protection against imposition and fraud in these cases." U. S. v. Teschmaker, 22 How. 405; U. S. v. Pico, Id. 406; U. S. v. Vallejo, Id. 416; U. S. v. Bolton, 23 How. 341; U. S. v. Power, 11 How. 577. The same doctrine has been applied to floating claims arising under the New Madrid acts. Hot Springs Cases, 92 U. S. 713, and cases there cited. In Fremont v. U. S., 17 How. 554, the court, in speaking of Spanish grants, said:

"These grants were almost uniformly made upon condition of settlement, or some other improvement, by which the interests of the colony, it was supposed, would be promoted. But until the survey was made, no interest, legal or equitable, passed in the land. The original concession granted on his petition was a naked authority or permission, and nothing more. But when he had incurred the expense and trouble of the survey, under the assurances contained in the concession, he had a just and equitable claim to the land thus marked out by lines, subject to the conditions upon which he had originally asked for the grant. But the examination of the surveyor, the actual survey, and the return of the plat were conditions precedent, and he had no equity against the government, and no just claim to a grant, until they were performed; for he had paid nothing, and done nothing, which gave him a claim upon the conscience and good faith of the government."

In order to avoid the force of these numerous cases, learned counsel for plaintiffs favored the court during the argument with plats purporting to indicate the land granted. These were made either by themselves or at their instance. They could only at best duplicate the plan or map to which Trudeau refers in his certificate, and which is not produced. For this effect they are not even persuasive in the most remote degree. They are based on four assumptions: First, that the hot springs are to be taken as the center of the tract; second, that the lines of the tract must have been contemplated as running east and west and north and south; third, that the tract must have been intended to be laid off in a square; and, fourth, that Trudeau must have intended to lay off the tract, and did lay it off, as thus indicated. Thus we have a conjectural reproduction of what was only a figurative survey. This is piling conjecture upon conjecture, neither of which is supported by any presumption of law or fact. It is needless to say that such vague speculations cannot be used as muniments of title.

We are referred by counsel for plaintiffs to Strother v. Lucas, 12 Pet. 438, where the court say:

"He who would controvert a grant executed by the lawful authority with all the solemnities required by law, takes on himself the burden of showing that the officer has transcended the powers conferred upon him, or that the transaction is tainted with fraud."

But in this case there is no showing that the acts required by law to be performed, viz. the making of an actual survey on the ground, the certification and approval of the same, the delivery of possession, were ever performed at all.

For the reasons stated, the court is of opinion that the grant and survey pleaded by the plaintiffs are not admissible in evidence in this cause, and hence the exceptions to them are sustained.

We are now called upon to consider the sufficiency of the demurrer to the complaint. Does the complaint state a prima facie cause of action? "When a complaint fails to state a fact which is essential to the cause of action, objection to it should be taken by demurrer." Fagg v. Martin, 53 Ark. 453, 14 S. W. 647; Wilson v. Spring, 38 Ark. 181. The court is of the opinion that the demurrer should be sustained for the following reasons:

1. The claim is barred under the act of congress of May 26, 1824, entitled "An act enabling the claimants to lands within the limits of the state of Missouri and territory of Arkansas to insti-tute proceedings to try the validity of their claims." 4 Stat. 52. This act permitted all persons claiming under French and Spanish grants to file petitions in various courts therein designated in order to have their titles confirmed. The fifth section is as follows:

"And be it further enacted, that any claim to lands, tenements or heredita-ments, within the purview of this act, which shall not be brought by petition before the said courts, within two years from the passing of this act, or which, after being brought before the said courts, shall, on account of the neglect or delay of the claimant, not be prosecuted to· a final decision within three years, shall be forever barred, both at law and [in] equity, and no other action at common law, or proceeding in equity, shall ever thereafter be sus-tained in any court whatever, in relation to said claims."

In respect hereof our attention is invited by counsel for the plaintiffs to the case of U. S. v. Percheman, 7 Pet. 90. But in that case the commissioners had no power save to report to con-gress. They were not, as the court declared, "a court exercising judicial power and deciding finally on titles." This act was several times extended; the last time for five years, by act of June 17, 1844 (5 Stat. 676). It does not appear from the complaint that Filhiol or any of his heirs or grantees ever complied with the terms of this act. But counsel for plaintiffs say that the act in question can have no application to perfect titles. Conceding that to be so, we cannot find that the claim sued upon was at any time a perfect title. In fact it lacked almost every essential element of perfection. We can only use the words of the supreme court:

"Claimant calls this a grant, and it is his privilege to do so; but it is in vain for him to expect that this court can give its sanction to any such mani-fest error." U. S. v. Castillero, 2 Black, 163.

2. The claim is barred by the act of congress known·as the "Hoʌ Springs Act." Under the provision of the act of June 11, 1870 (16 Stat. 149), all persons claiming title, either legal or equitable, "to the whole or any part of the four sections of land constituting what is known as the 'Hot Springs Reservation,' in Hot Springs county, in the state of Arkansas," had an opportunity to insti-tute suit, in the nature of a bill in equity, against the United

States in the court of claims, "and prosecute to final decision any suit that may be necessary to settle the same; provided, that no such suits shall be brought at any time after the expiration of ninety days from the passage of this act, and all claims to any part of said reservation upon which suit shall be not brought under the provision of this act within that time shall be forever barred." No valid reason can be shown why this statute did not apply to the Filhiol claim as well as to other claims. There is an alleged loss of the grant and survey, but that would not suspend or change the effect of the statute. In no case is the running of a statute of limitation suspended by causes not mentioned in the act itself. Braun v. Saurwein, 10 Wall. 218; Montgomery v. Hernandez, 12 Wheat. 129; Erwin v. Turner, 6 Ark. 14; Bank v. Morris, 13 Ark. 291; Pryor v. Ryburn, 16 Ark. 671; Smith v. Macon, 20 Ark. 18; Railway Co. v. B'Shears, 59 Ark. 241, 27 S. W. 2.

3. After so great a lapse of time, the claim, if originally valid, must be considered as having been abandoned. In U. S. v. Hughes, 13 How. 3, a delay of 40 years to bring suit to enforce a Spanish claim was held to be fatal. In U. S. v. Philadelphia, 11 How. 652, a delay of 40 years was held to be a constructive abandonment. In Fuentes v. U. S., 22 How. 460, the court came to the same conclusion, though the delay could not have been for more than 50 years. In U. S. v. Repentigney, 5 Wall. 211, an abandonment was presumed from a delay to bring suit for more than 100 years, during which time the claimants had been in possession for more than 4 years. In U. S. v. Moore, 12 How. 222, the same presumption was raised where the plaintiffs had delayed to sue for nearly 50 years. In Valliere v. U. S., Hempst. 338, Fed. Cas. No. 16,822, the same presumption was indulged where the delay was for more than 50 years. It does, indeed, appear that the heirs of Filhiol brought a suit for confirmation in the name of James Ball, as assignee, in the superior court of Arkansas territory, under the act of May 26, 1824, which was pending at the time that the various suits on the forged grants mentioned in U. S. v. Samperyac, supra, were also pending; that a question of forgery in the Ball Case was also raised, and that, on a rule being made by the court for the production of the original papers, and on noncompliance therewith, the suit was dismissed (Frauds in Land Titles in Arkansas. 5 Ann. St. Papers, 364, 365, 366, 430, 338); but this is certainly no adequate showing of diligence. The American State Papers, having been published under authority of law, are evidence of whatever they contain. Watkins v. Holman, 16 Pet. 50, 55; Bryan v. Forsythe, 19 How. 334. I could not be more or less impressed, in passing on the exceptions, with the circumstances that both the survey and the grant are apparently written by the same hand, on the same kind of paper, and with the same ink; that both contain words badly spelled, and ungrammatical phrases, showing that they were gotten up by illiterate persons; and that, though the grant purports to be attested by the armorial seal of the governor, yet there is no impression of a seal of any kind, but merely a seal of wax, evidently made to adhere to the paper by the application of

some smooth surface. It is said by counsel for plaintiffs that by the Spanish law no seal was required to such a grant as this, and that a flourish at the end of the signature, such as appears in this instance, might be used instead. Conceding this to be so, it is still singular that the grant should explicitly state that it was "sealed with the seal of our arms," and that a blank seal should be attached. The alleged long loss of the papers "artistically described in the testimony," as was said in a case growing out of a like grant (in U. S. v. Castillero, 2 Black, 185), seemed also to be a suspicious circumstance. In U. S. v. Vallejo, 1 Black, 541, it was held that "a false note of the attesting secretary at the bottom of the grant that it had been registered is a serious objection to the claim under it." A like note appears at the bottom of the grant in this case, though there is no pretense that the grant was ever registered. It would be a mere affectation to pretend that thoughts of this kind, growing out of the well-known history of Spanish claims in Arkansas, have not intruded themselves on the mind of the court. Indeed, they have a certain bearing on the point under consideration, for they afford some very plausible reasons to account for the long delay of the claimants in asserting their rights in the courts; some reason why they twice at an interval of several years importuned congress for special legislation which might seem to be some sort of a recognition of the validity, or at least of the merits, of their claim; reasons why they should have brought a tentative suit in the court of claims for rents on these lands, and why, eventually, after the lapse of so long a time, after the death of all witnesses who knew anything about the matters in dispute, final resort should be had to this court. But, though this view of the case has been pressed in argument, the court does not find it necessary to do more than advert to it for the sole purpose of vindicating the principles of law involved in this controversy, the expression of the collective wisdom and foresight of generations, which renders success in cases of this sort hopeless.

It must also be conceded that the present suit makes no appeal to our sense of justice. As shown by the facts alleged in the complaint, Juan Filhiol never paid anything for the land sued for. He never paid even the trival fee necessary to be paid in order to have his grant registered. He never complied with the terms of the grant, or with the requirements of the laws in force at the time that, as alleged, the lands were donated to him. The taxes that have accrued on the property covered by the grant during so many years, with accrued interest, must amount to a very large sum, of which it is extremely improbable that the plaintiffs have paid anything. In 1788 the hot springs were upon lands occupied and owned by a tribe of Indians, and were far from any European settlement. They were in the midst of an unbroken wilderness, and they could be reached from such places as New Orleans or St. Louis only after many days of arduous travel through a country where there were only rude Indian trails instead of roads. Such a journey would have been attended by perils and by every kind of discomfort. It could only be made by men in robust health and in the full vigor of

life.  Before the application of steam to navigation, our water courses would have impeded, rather than assisted, the traveler.   The country had but few white inhabitants.    New Orleans was only a small town, and St. Louis was an obscure village on the extreme margin of the vast and unexplored wilderness stretching from the Mississippi river to the Pacific.    Only De Soto, in 1541, and a few later explorers of the white race, had ever seen the springs.    Their medicinal qualities, a hundred and six years ago, were unknown; but, having been ascertained after the cession in 1818, the United States government bought up the title of the Indians.    In 1832, recognizing the great importance of the springs to the general public, it reserved the property from entry and sale forever; and for their use it now holds it in trust, if not in deed, for the heirs of Filhiol.   In the meantime, before the commencement of this suit, a thriving and prosperous city had been built up around the springs.    The federal government had spent large sums for hospitals and in improving and beautifying its property.    By the joint labor and money of private citizens, the municipality, and the federal government, streets had been laid out, parks had been established, churches and schoolhouses had been erected, and railway connections with the rest of the continent had been created.    In hotels alone provision had been made for guests and for the traveling public at an expense of millions of dollars.    Many of the citizens and others have made these investments largely because they supposed that the springs themselves would be perpetually under the control of the federal government, and would be managed with its usual fairness and generosity. If they should be decreed to be private property, the event would simply be a public and private calamity of incalculable magnitude. They would become an unending monopoly; their control the subject-matter for greed, avarice, selfishness, extortion, and all the whims and caprices of private individuals under no responsibility to the public; owners who might, if they though fit, wholly exclude others from the healing waters, or impose such conditions upon access to them as would be intolerable.    The plaintiffs, however, after so long a delay, during which time they have never spent a cent in the great work of making these many enduring and costly improvements, now ask that they may reap where they have not sown. But it has often been held that if one sees another making costly improvements on his lands, believing them to be his own, without any assertion of title, he will be estopped from claiming an adverse title. Erwin v. Lowry, 7 How. 172; Kirk v. Hamilton, 102 U. S. 68; Close v. Glenwood Cemetery, 107 U. S. 466, 2 Sup. Ct. 267; Jowers v. Phelps, 33 Ark. 465.   No stronger case than the present, as coming within this principle, is likely to occur.

On the grounds stated, the demurrer to the complaint is sustained, and an order will be entered that, unless the plaintiffs amend within 30 days from this date, this suit shall be dismissed.